**Albert GALBREATH et al., Plaintiffs-Appellants,**

v.

**GULF OIL CORPORATION, Defendant-Appellee.**

No. 27057.

United States Court of Appeals
Fifth Circuit.

June 17, 1969.

David H. Fink, Bullock, Yancey & Mitchell, Atlanta, Ga., for plaintiffs-appellants.

A. G. Cleveland, Jr., George B. Haley, Jr., Albert C. Tate, Jr., Gene F. Presley, John C. Bracy, Atlanta, Ga., for defendant-appellee; Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Atlanta, Ga., of counsel.

Before COLEMAN and SIMPSON, Circuit Judges, and MEHRTENS, District Judge.

MEHRTENS, District Judge:

This was an action for overtime compensation under the Fair Labor Stand-

ards Act of 1938, 29 U.S.C. § 201 et seq., (hereinafter FLSA) by Gulf Oil Corporation truck drivers against Gulf. The case was heard without a jury on a stipulation of facts, the briefs, and oral arguments of counsel. The District Court entered judgment for the defendant Gulf and dismissed the action on the ground that the plaintiffs were exempt from the overtime provisions of the FLSA by virtue of § 13(b) (1) thereof because the transportation performed by plaintiffs for Gulf was a part of a "continuously moving" shipment of goods in interstate commerce, and the plaintiffs were therefore employees with respect to whom the Interstate Commerce Commission had the power to establish qualifications and maximum hours of service under § 204 of the Motor Carrier Act, 1935, 49 U.S.C. § 304. Plaintiffs appealed. We affirm.

The FLSA provides that any employee who "is engaged in commerce or in the production of goods for commerce" shall be paid a minimum of one and one-half his hourly wage for every hour over 40 hours he works in any workweek. 29 U.S.C. § 207(a) (1). (It was stipulated by the parties that plaintiffs are covered by this section and that they were not paid for time worked in excess of forty hours.) Title 29 U.S.C. § 213(b) (1), however, exempts from these overtime provisions

"any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 304 of Title 49 * * *."

It is the applicability of this exemption to the facts of this case which is questioned on this appeal. Section 304 of Title 49 referred to in the § 213(b) (1)

FLSA exemption is contained in the Motor Carrier Act, 1935, 49 U.S.C. § 301 et seq. (hereinafter MCA). This Act provides in part that the Interstate Commerce Commission shall, if need therefor is found, establish for private motor vehicle carriers[1] reasonable requirements to promote safety including maximum hours of employees' service. 49 U.S.C. § 304(a) (3). The I.C.C. power under the MCA extends to "motor carriers engaged in interstate or foreign commerce." 49 U.S.C. § 302(a). "Interstate commerce" is defined in the Act as

"commerce between any place in a State and any place in another State or between places in the same State through another State, whether such commerce moves wholly or partly by motor vehicle and partly by rail, express, or water." 49 U.S.C. § 303(a) (10).

During the period in issue in this case[2] plaintiffs were employed by Gulf at its Atlanta, Georgia Bulk Plant. Petroleum products are distributed from this bulk plant primarily to Gulf retail service stations and consuming accounts. The plaintiffs' duties consisted mainly of driving transport trucks or tank wagon trucks from the Atlanta Bulk Plant to various locations within the area served by the plant. Their duties were performed solely within Georgia; they did not cross state lines.

All of the products ultimately transported by plaintiffs were shipped by Gulf to the Chattahoochee Terminal, located across from Gulf's Bulk Plant, via the 36-inch pipeline of Colonial Pipeline Company from Gulf's refinery at Port Arthur, Texas, or Gulf's Black Creek refinery at Collins, Mississippi, to Colonial's break-out facilities at Powder Springs, Georgia, and from Powder Springs via

1. It is not disputed that Gulf is a "private carrier".
    "The term 'private carrier of property by motor vehicle' means any person not included in the terms 'common carrier by motor vehicle' or 'contract carrier by motor vehicle', who or which transports in interstate or foreign commerce by motor vehicle property of which such person is the owner, lessee, or bailee, when such transportation is for the purpose of sale, lease, rent, or bailment, or in furtherance of any commercial enterprise." 49 U.S.C. § 303 (a) (17).

2. The period in issue is July 25, 1964 through October 1, 1965.

Colonial's 8-inch stub line approximately 12 miles to the Chattahoochee Terminal. Colonial Pipeline is a corporation owned by nine major oil companies with Gulf owning 14%. The products transported by plaintiffs were loaded into trucks driven by plaintiffs at the Chattahoochee Terminal loading rack of Southeast Terminals, Inc., a corporation jointly owned by Gulf and by Pure Oil Corporation.

The transported products are the identical products tendered to and shipped via Colonial Pipeline Company lines from Gulf's refineries; there is no commingling of product in transit. Gulf withdraws at the Chattahoochee Terminal the same Gulf products tendered at the refinery for shipment through Colonial's pipelines. The products diverted through the Powder Springs, Georgia stub line from the main 36-inch line consist of an amount of transported product determined prior to tender to Colonial. This product is "bled off" at Powder Springs from a much larger "slug" of Gulf products tendered at one of its refineries and moving along the main pipeline destined for Gulf delivery points at Atlanta and other locations on the main line. The amount to be moved to the Chattahoochee Terminal, as well as to all other points along the Colonial line (which terminates in Linden, N. J.) is determined by Gulf prior to the initial tender of product for movement at the refinery. With the exception of a de-icer added to Gulf A-1 Jet Fuel delivered to one customer served by Gulf's Atlanta Bulk Plant, no processing or alteration of the transported products occurs at the Chattahoochee Terminal or at any location after the product leaves the refinery, nor does the introduction of additives occur at any time after the products leave the refinery.[3]

68% of the total gallonage in the Atlanta Bulk Plant was delivered by plaintiffs pursuant to an AUTOMOTIVE GASOLINE AGREEMENT which Gulf has with retail gasoline dealers. Under the agreement Gulf may deliver its products "in such quantities and at such times as Gulf sees fit" as long as Gulf maintains "sufficient volumes of such grades of gasoline to always provide [each] Dealer an adequate supply to meet the requirements of his trade for such automotive gasolines." The station equipment in all of these retail stations, including tanks, pumps, lifts and air compressors, is owned by Gulf. Sometimes it is obtained on loan from Gulf by the dealer under a Memorandum of Agreement to lease. Title to the gasoline remains in Gulf under the AUTOMOTIVE GASOLINE AGREEMENT until the gas is actually pumped by the dealer in the course of a retail sale. The requirements of the retail stations are computed and projected with reasonable certainty by Gulf sales representatives.

29% of the total gallonage in the Atlanta Bulk Plant was delivered by plaintiffs to Gulf's "consuming accounts." These accounts are committed to Gulf by contracts of at least one year duration providing for the purchase of either a specified gallonage or of the Gulf petroleum requirements of such consuming account. Because of these contracts 99.9% of the requirements of such consuming accounts are known to Gulf before tender at the refinery for shipment to Atlanta. During the period in issue, unanticipated local sales at the terminal accounted for an average of only 0.1% of the total terminal volume. Except for such unanticipated sales, Gulf does not sell at wholesale from the Atlanta Plant.

The remaining 3% was sold to heating oil jobbers. During the period in question, of the approximately 84% of the total gallonage of product shipped by Gulf from the Chattahoochee Terminal which was shipped by means of Gulf trucks driven by plaintiffs and other Gulf drivers, approximately 93% was delivered directly from the terminal to retail service stations and consuming accounts,

---

3. Plaintiffs have not made an issue over this small amount of processing and neither do we. The adding of the de-icer to an insignificant amount of the total gallonage at the Atlanta Bulk Plant has no effect on the continuity of movement in interstate commerce.

while the remaining 7% was delivered to bulk plants of distributor-consignees.

The demand for the products delivered by plaintiffs from the Atlanta Bulk Plant is computed by evaluation of the contractual commitments referred to above and prior sales experience. The "terminal demand" for product at the Atlanta Bulk Plant arising from the contractual obligations is consolidated in the form of a monthly forecast by grade of product for twelve months and is forwarded to Gulf's Product Supply Division of its Manufacturing Department in Houston, Texas. These terminal demands are further consolidated in Houston into refinery demands for refined product, which dictate the movement of crude oil from the well-head. The terminal forecast is updated monthly. Sixty days prior to receipt of product at Atlanta a projected shipping schedule showing quantity and grades of product is prepared and forwarded from Atlanta to Houston. On the average this schedule contains projections of required supply of product which are within 2% of the amount which subsequently is actually delivered in the month for which the projection is made. Thirty days prior to expected receipt, a firm shipping schedule is forwarded from Atlanta to Gulf's Houston Products Supply Division.

With the exception of one heating oil, all transported products are tendered by Gulf to Colonial for shipment on a ten-day cycle. That is, Gulf tenders to Colonial a "slug" of its products, predetermined amounts of which are to be "bled off" the "slug" at Gulf delivery points along the line. Product destined for the Chattahoochee Terminal requires ten days in transit, and each "slug" tendered for the Chattahoochee Terminal constitutes approximately a ten-day supply. Gulf's refinery facilities, viewed in the light of demand for its products, were and are such that the refined product

is in short supply. In addition, good business practices dictate that a minimum of funds be tied up in inventory. For these reasons there customarily is in supply at the Chattahoochee Terminal an average of less than five days' supply of the transported products at the time of arrival of a "slug" of products, and an average of between twelve and fifteen days' supply immediately after the delivery of a "slug" into Gulf's tanks at the Chattahoochee Terminal. On the average, approximately two-fifths of the capacity of Gulf's tanks at the Chattahoochee Terminal is used.

One of the purposes in maintaining the Chattahoochee Terminal of Southeast Terminals, Inc. is to change the mode of transportation of petroleum products from pipeline to motor carrier.

If the Interstate Commerce Commission has the power [4] under the MCA to establish safety requirements, including maximum hours of employees, with respect to the plaintiffs in this case, then plaintiffs fall within the MCA exemption to the FLSA and are not entitled to overtime compensation. Section 207 of the FLSA providing for overtime pay covers employees "engaged in commerce or in the production of goods for commerce." This coverage is broader than that in the Section 213(b) (1) Motor Carrier Act exemption where the employee himself must be engaged in interstate transportation. Walling v. DeSoto Creamery and Produce Co., 51 F.Supp. 938 (D. Minn.1943). Whether the Motor Carrier Act exemption applies in this case is dependent upon whether the petroleum product came to rest in Atlanta and lost its interstate character or whether there was a continuity of movement of the goods from the refineries *through* the Atlanta plant and terminal such that the petroleum was at all times part of interstate commerce.

---

4. The exemption from the overtime provisions of the Fair Labor Standards Act provided by § 13(b) (1) is not dependent on the *exercise* of power by the Interstate Commerce Commission. It is only necessary that the I.C.C. *have* the power. Southland Gasoline Company v. Bayley, 319 U.S. 44, 63 S.Ct. 917, 87 L. Ed. 1244 (1944).

Preliminarily, we note that questions of "movement," "cessation of movement", and "interruption of movement," are factual. Kline v. Wirtz, 373 F.2d 281 (5th Cir. 1967). Therefore, the trial court's determination that the petroleum products were *continuously moving* in interstate commerce until they reached the retail service stations, consignees, and consuming accounts cannot be set aside unless found to be clearly erroneous. Rule 52(a), Fed.R.Civ.Pro.

In Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1943), dealing with the applicability of the FLSA, the Supreme Court said in establishing the "practical continuity of movement" test to determine the relationship of one-state activities to interstate commerce:

> "The entry of the goods into the warehouse interrupts but does not necessarily terminate their interstate journey. A temporary pause in their transit does not mean that they are no longer "in commerce" within the meaning of the Act. * * * if the halt in the movement of the goods is a convenient intermediate step in the process of getting them to their final destinations, they remain "in commerce" until they reach those points. Then there is a practical continuity of movement of the goods until they reach the customers of whom they are intended. That is sufficient. Any other test would allow formalities to conceal the continuous nature of the interstate transit which constitutes commerce." *Id.* at 568, 63 S.Ct. at 335.

Allesandro v. C. F. Smith Co., 136 F.2d 75, 149 A.L.R. 382 (6th Cir. 1943), enumerated the three circumstances in *Jacksonville Paper* under which the goods were bought from out of state and sold and distributed to retailers within the state:

1) Goods purchased by the wholesaler upon order of a customer with the definite intention that they be carried at once to the customer.

2) Goods obtained by the wholesaler to meet the needs of specified customers pursuant to an understanding, though not for immediate delivery.

3) Goods based on anticipation of the needs of specific customers, rather than upon prior orders or contracts.

*Jacksonville Paper* held that the goods in categories 1 and 2 remain in interstate commerce until the time they are delivered to the retail customers. Goods in the third category could be held to remain in commerce only where there is a particularity of evidence to show that the goods in question are "different from goods acquired and held by a local merchant for local disposition." Walling v. Jacksonville Paper Co., at 570, 63 S.Ct. at 336.

In the *instant case*, 29% of the goods (total gallonage at the Atlanta Bulk Plant) in question was delivered to Gulf's consuming accounts who were committed by contract to purchase either a specified gallonage or all of their Gulf petroleum requirements. The requirements of all these accounts were known in advance by Gulf to a 99.9% certainty. The petroleum delivered pursuant to a contract for specified gallonage clearly falls within the second category of *Jacksonville Paper*. As to the remainder of the petroleum delivered to consuming accounts and all of the petroleum delivered pursuant to the AUTOMOTIVE GASOLINE AGREEMENT (68% of the total gallonage at the Atlanta plant) we hold these quantities were also in the second category of *Jacksonville Paper*. In both instances there was a definite understanding, in fact a contract, to meet the needs of specified customers.[5]

---

5. Even if the petroleum in question could be held not to fall within the second category, we would hold that it is in the third category and that it is in commerce because there is a particularity of evidence showing that the petroleum in question is different from goods acquired and held by a local merchant for local disposition. As in Mitchell v. C & P Shoe Corp., 286 F.2d 109 (5th Cir. 1960), we are not dealing with a merchant who offers his wares to the public

That the petroleum in question did not come to rest at the Atlanta Bulk Plant but passed through it in a "practical continuity of movement" is further supported by Shew v. Southland Corp., 370 F.2d 376 (5th Cir. 1966). There we held that dairy products which came from out of state and stopped in Dallas temporarily were part of a continuous movement in interstate commerce so that truck drivers who delivered the products from the Dallas plant to other points in Texas were engaged in interstate commerce and therefore fell within the Motor Carrier Exemption to the FLSA and were not entitled to overtime compensation. One of the bases of that decision was that no processing took place at the Dallas facility.

Plaintiffs attempt to distinguish the above authorities on the ground that the goods in question in each of those cases were non-fungible while the product in the instant case is fungible. We reject any such distinction. Mid-Continent Petroleum Corp. v. Keen, 157 F.2d 310 (8th Cir. 1946), found that gasoline brought in from out of state via a pipeline partly owned by the defendant and then carried to its bulk plants and distributed to its service stations within the state remained in interstate commerce and cited Walling v. Jacksonville Paper Co. as controlling. In Wirtz v. Lunsford, 404 F.2d 693 (6th Cir. 1968), a case involving part of the same Gulf petroleum distribution system which is in issue here, the Sixth Circuit reversed a district court holding that light oil products were fungible goods which lost their identity as interstate commerce when they came to rest in Gulf's Knoxville storage tank. The Court said:

"It is clear to us that the light oil products remain in 'commerce' within the meaning of the Act [FLSA] until delivered to service stations under the

terms of defendants' agreements with Gulf.

It is our view that these products are in practical continuity of transit from the time they leave Gulf's facilities at Port Arthur, Texas until they are delivered to the intended customers in Tennessee, and the Knoxville storage tanks serve only as an intermediate step in that movement. Such is the holding in Walling v. Jacksonville Paper Co., * * * which we think is decisive on this issue." Id. at 696.

The Interstate Commerce Commission determination relative to transportation of petroleum products cited by plaintiffs, Ex Parte No. MC–48, decided March 7, 1957, 77 M.C.C. 17–32, is not applicable here. There, pipeline terminal turnover varied from twice a month to one turnover every two months and the actual volumes purchased in any given period were not directly related to the contract minima and maxima as they are in this case. Furthermore, the product was commingled in transit with products of other petroleum companies. Frequently, the products were processed further.

In answer to plaintiffs' point that the FLSA is a remedial statute which should be liberally construed and that all exemptions therefrom should be strictly construed, we quote from the district court's order of dismissal:

"[T]he MCA is likewise a remedial statute and should also be broadly construed. Crescent Express Lines v. United States, 320 U.S. 401, 409, 88 L.Ed. 127, 64 S.Ct. 167 (1943). The cases cited by plaintiffs, relating to a claimed exemption or exception of a particular occupation or status, are therefore not in point. Without discussing them in detail, none of plaintiffs' citations go so far as to hold, or even to suggest, that as between two remedial statutes, each entitled to a

---

at large. 68% of the petroleum is delivered to gas stations owned entirely by Gulf or whose equipment is owned by

Gulf. In other words, Gulf is distributing to itself.

broad construction, one should be narrowly construed merely because its coverage was made exempt under the other.

One further point was covered by the district court which none of the parties raised either there or on appeal. The MCA defines commerce as movement between states whether it moves "partly by motor vehicle and partly by rail, express, or water." 49 U.S.C. § 303(a)(10). In this case we are dealing with a connecting shipment moving partly by motor carrier and partly by pipeline. We agree with the district court that "rail, express, or water" are not words of limitation but were inserted by Congress to illustrate the breadth of the jurisdiction over commerce. "[C]ommerce [among the states] is not a technical legal conception, but a practical one, drawn from the course of business." Swift & Co. v. United States, 196 U.S. 375, 398, 25 S.Ct. 276, 280, 49 L.Ed. 518 (1905).

In this case the products were shipped on the basis of contractual commitments with consumers. Gulf retained control over the products from the time they left the refinery until they were delivered to the consumer. The products did not stay at the bulk plant for an indeterminate time; rather they were moved according to a predetermined schedule on a fairly regular basis. At least one of the major purposes of maintaining the Chattahoochee Terminal was to change the method of transporting the products. The products involved were neither commingled during transit nor processed in any way at the terminal. They did not come to rest at the terminal and were part of a continuity of movement in interstate commerce. Therefore, the truckdrivers who delivered them to retail customers were engaged in interstate commerce within the MCA exemption to the FLSA and are not entitled to the overtime compensation provided for in the FLSA. Accordingly, the judgment is

Affirmed.