**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————————

**No. 04-1652**

—————————

JAMES TALTON, JR.,

                                        Plaintiff - Appellant,

        versus

I.H. CAFFEY DISTRIBUTING COMPANY,
INCORPORATED; CHRISTOPHER CAFFEY,

                                        Defendants - Appellees.

—————————

Appeal from the United States District Court for the Middle District of North Carolina, at Durham. William L. Osteen, District Judge. (CA-02-1048)

—————————

Argued:  December 2, 2004            Decided:  January 18, 2005

—————————

Before KING and SHEDD, Circuit Judges, and Henry F. FLOYD, United States District Judge for the District of South Carolina, sitting by designation.

—————————

Affirmed by unpublished per curiam opinion.

—————————

Robert James Willis, Raleigh, North Carolina, for Appellant. Carl Ray Grantham, Jr., ROBINSON & LAWING, Winston-Salem, North Carolina, for Appellees.

—————————

PER CURIAM:

James Talton, Jr., a former delivery route driver for North Carolina malt beverages and wine wholesaler and distributor I.H. Caffey Distributing Co., Inc., and principal Christopher Caffey (collectively "Caffey"), appeals the district court's ruling on summary judgment that he is not entitled to overtime benefits pursuant to the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. §§ 201-219. See Order and Judgment at 1 (April 16, 2004), adopting Order and Recommendation of United States Magistrate Judge (March 11, 2004) (the "Opinion"). The district court agreed with Caffey that Talton transported goods in interstate commerce, implicating the Motor Carrier Act exception to the FLSA, 29 U.S.C. § 213(b)(1), and precluding his claim for benefits. Opinion at 14. For the reasons that follow, we affirm.

I.

Caffey is headquartered in Guilford County, North Carolina, and licensed by the North Carolina Alcoholic Beverage Control Commission ("ABCC") as the exclusive distributor of certain beer products, including those manufactured by Miller, Coors, Heineken, Guinness, St. Pauli, and Pabst, for several North Carolina counties. During the relevant time period, Caffey's warehouse in Greensboro sold approximately 3,400,000 cases and 18,000 kegs of beer per year. Approximately fifty percent of that volume was either produced at the Miller plant in Eden, North

2

Carolina, or produced by Miller outside the state and transshipped at the Eden plant. Approximately ten percent was produced at and shipped directly from the Miller plant in Albany, Georgia; twenty percent was produced at or transshipped from the Coors plant in Elkton, Virginia; and the remaining twenty percent was produced at and shipped from various manufacturers' plants outside North Carolina or outside the United States.

Wholesalers like Caffey are prohibited by the North Carolina Administrative Code from requiring a retailer to purchase their beer pursuant to a contractual purchase agreement. N.C. Admin. Code tit. 4, r. 2T.0706. However, by virtue of its ABCC license, Caffey and other wholesalers are nonetheless required to meet the orders of retailers in their assigned distribution areas, regardless of account size or distance from the warehouse. Id. at r. 02T.0610. Caffey's sales representatives must therefore estimate how much product a retailer will need on the next delivery, sometimes by talking to retailer managers, and, if the manager is unavailable, through analyzing sales data and determining, based on a retailer's current inventory and sales history, how much beer should be ordered. The representatives promptly enter the estimated quantity for those retailers into handheld devices that transmit orders electronically to Caffey's warehouse in Greensboro.

Turnover among licensed retailers in Caffey's geographical area is less than five percent per year, so Caffey's customers are a stable group. Talton testified by affidavit that each retailer to which he delivered typically had a certain amount of display space allocated to Caffey products, and that this space allocation "did not change." Talton Second Aff. at ¶ 9. The frequency of deliveries and amount of product in each delivery fluctuated. Id. at ¶ 19.

Talton began working for Caffey as a "driver/sales representative" on September 15, 1998. On February 25, 2000, he was assigned to a "swing-route driver" position. As a swing-route driver, Talton did not have any pre-assigned routes, but instead filled in as needed on any route that was missing a driver. All of Talton's routes were in North Carolina, though he once crossed into Virginia briefly while en route to a North Carolina distributor situated near the North Carolina/Virginia state line.

At each of the retailer locations, Talton's duties included printing an invoice for the beer delivered, obtaining the retailer's approval for the beer, unloading it, pricing it, stocking it, and securing payment. Drivers such as Talton also sometimes returned kegs used by the retailers to Caffey's warehouse, which Caffey returned to the manufacturers for credit, reuse, and recycling. After suffering an on-the-job injury, Talton

ceased performing the duties of a swing-route driver for Caffey on June 11, 2002.

On November 29, 2002, Talton filed a complaint against Caffey in the Middle District of North Carolina, alleging that Caffey had failed to pay him all regular and overtime wages when due, in contravention of the FLSA and the North Carolina Wage and Hour Act ("NCWHA"), N.C. Gen. Stat. §§ 95-25.1 et seq. He sought a declaratory judgment, compensatory damages, and liquidated damages, plus interest, attorney's fees, and costs. In its Answer, Caffey contended that it was exempt from both the FLSA and NCWHA as to Talton because of the interstate nature of Talton's duties, see Amended Answer at 4-5, and that in the event that it was not exempt, its actions were in good faith. Id. at 6.

After discovery was conducted, both parties moved for summary judgment on Talton's FLSA claim for unpaid overtime wages under § 207(a)(1). On April 16, 2004, in adopting the magistrate judge's recommendations, the district court denied Talton's motion for summary judgment and granted Caffey's. Order and Judgment at 1-2. The court reasoned that though Talton's delivery was solely intrastate, the beer itself was an article travelling in interstate commerce, making the Motor Carrier Act applicable and thus exempting Caffey from the FLSA's overtime requirements.[1] See

---

[1] Caffey also moved for summary judgment on Talton's NCWHA claim for unpaid wages, arguing that Talton was not entitled to the unpaid wages under the NCWHA, and that his employment was not

Opinion at 10-13.  Talton filed a timely notice of appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

On appeal, Talton contends that the Opinion utilized and applied incorrect legal principles, impermissibly resolved issues of disputed fact, and applied the legal standard to the facts incorrectly.  We review a district court's award of summary judgment de novo, viewing the facts and drawing all inferences in the light most favorable to the non-moving party.  See Seabulk Offshore, Ltd. v. Am. Home Assurance Co., 377 F.3d 408, 418 (4th Cir. 2004).  An award of summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact is one "that might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Because we find no error in the judgment, we affirm.

_____

covered by the NCWHA.  The district court granted this motion as well, adopting the magistrate judge's assessment that "evidence before the Court demonstrates that Defendants' deduction of cash shortages from Plaintiff's paychecks met all of the NCWHA's statutory and regulatory requirements."  Opinion at 16.  The magistrate judge also recommended that the district court deny a number of motions from both sides as moot. Opinion at 18.  Talton has appealed the FLSA ruling only.

6

A.

The FLSA establishes a forty-hour workweek for covered employees and provides for compensation at time-and-a-half for those weekly hours in excess of forty. Section 207(a)(1) provides as follows:

> [N]o employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1). To establish a claim for unpaid overtime wages, Talton must establish by a preponderance of the evidence (1) that he worked overtime hours without compensation, (2) the "amount and extent" of the work "as a matter of just and reasonable inference," and (3) that Caffey knew of the uncompensated overtime. See Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687 (1946); see also Davis v. Food Lion, 792 F.2d 1274, 1276 (4th Cir. 1986). Talton must also show that Caffey was an enterprise engaged in interstate commerce. 29 U.S.C. § 207(a)(1).

In his motion for summary judgment as to liability, Talton maintained that the undisputed facts established each of these elements. Caffey admits that it is engaged in interstate commerce, that Talton worked overtime during the relevant period, and that he was not paid overtime wages during that time. The

Opinion accordingly concluded that Talton had made a prima facie showing of his entitlement to overtime compensation. Opinion at 7.

Caffey maintained, however, that Talton's employment was exempt from the FLSA under the Motor Carrier Act exemption, set forth at 29 U.S.C. § 213(b)(1). That exemption provides that the FLSA overtime requirements do not apply to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49 [the Motor Carrier Act]." Id. The Motor Carrier Act gives the Secretary of Transportation jurisdiction, inter alia, over interstate transportation by a motor carrier, 49 U.S.C. § 13501, and authority to establish qualifications and maximum hours of service for covered employees. 49 U.S.C. § 31502. Courts have interpreted this authority to extend not just to carriers who actually cross state lines while transporting goods, but also to carriers whose cargo originates from outside the state or is ultimately bound for a destination outside the state, even where the carrier's route is entirely intrastate. See, e.g., Bilyou v. Dutchess Beer Distrib., 300 F.3d 217, 223 (2d Cir. 2002); Merch. Fast Motor Lines, Inc., v. I.C.C., 528 F.2d 1042, 1044 (5th Cir. 1993).

Caffey contends that Talton is covered by the Motor Carrier Act, and thus exempt from the provisions of the FLSA, because the beer Talton carried and delivered was an item in

8

interstate commerce.  Talton counters that the beer he carried and delivered on his intrastate delivery routes had ceased to be an item in interstate commerce, and for that reason he does not fall within the Motor Carrier Act exemption.  Thus, Talton argues, he is covered by the FLSA and entitled to overtime pay.

The question, then, is simple:  whether the beer's pause in Caffey's Greensboro warehouse was of such a character as to bring its interstate journey to an end.  In Walling v. Jacksonville Paper Co., 317 U.S. 564 (1943), the Supreme Court analyzed whether goods imported from outside the state by a wholesaler for in-state sale, and temporarily stored in a warehouse before subsequent movement to their in-state destination, are nevertheless still items in interstate commerce during the second, in-state leg of their journey.  The Court identified and discussed three possible fact  patterns for assessing the interstate commerce issue:  (1) where items were ordered pursuant to a pre-existing contract with a specific customer; (2) where items were ordered pursuant to a pre-existing understanding with a customer, though not pursuant to a  written  contract;  and  (3)  where  items  were  ordered  in anticipation of the needs of customers.  317 U.S. at 335-36; see also Galbreath v. Gulf Oil Corp., 413 F.2d 941, 945 (5th Cir. 1969) (listing three Jacksonville Paper fact patterns); Allesandro v. C.F. Smith Co., 136 F.2d 75, 77 (6th Cir. 1943) (same).

9

Talton maintains that our Circuit has interpreted and applied the principles of Jacksonville Paper narrowly, such that "interstate" movement will continue after temporary stoppage at a warehouse only if a specific customer has "ordered the goods." Appellant's Br. at 11 (quoting Schroepfer v. A.S. Abell Co., 138 F.2d 111, 114 (4th Cir. 1943)). Talton contends that, because of this narrow interpretation, the district court used the incorrect legal standard when it relied on authorities from the Fifth and Sixth Circuits, embodied in the Galbreath and Allesandro decisions. Opinion at 10.

On careful analysis, we see Talton's contention on this point as without merit. First, contrary to what Talton maintains, we did not broadly conclude in Schroepfer that the in-state leg of a shipment of goods from outside the state is not in interstate commerce unless in-state customers have previously "ordered the goods." Rather, Schroepfer merely used the phrase "ordered the goods" to characterize how the facts of Jacksonville Paper differed from a companion case, Higgins v. Carr Bros. Co., 317 U.S. 572 (1943). See Schroepfer, 138 F.2d at 114. Nor was the fact that no customer had "ordered the goods" in Schroepfer deemed to be dispositive. Rather, in Schroepfer, the product at issue was a newspaper, and two employees, whose jobs were to distribute newspapers to racks and vendors, sued the publishing company for minimum wages and overtime, on the theory that their employment was

10

in interstate commerce because the newspaper gathered out-of-state news and used it to produce the newspaper. We simply determined that the defendant's newspaper business was not the sale of the interstate news, as would be the business of a "telegraph company or a news service," because the company took the interstate news and used it as it saw fit to create a new product, a newspaper, which the plaintiffs distributed. Id. As a result, the intrastate distribution of locally produced newspapers was not "so closely related to the movement of the [interstate] commerce" as to cause the distribution of the papers to constitute interstate activity. Id. at 113-14. Put simply, we neither discarded nor narrowed the Jacksonville Paper categories. As a result, the decisions of the Fifth and Sixth Circuits in Galbreath and Allesandro, relied on in the Opinion, are not, as maintained by Talton, "materially different" from the applicable principles in this Circuit.

Further, Talton's contention that the products that he carried could not remain in interstate commerce because they were not specifically ordered by Caffey's customers contravenes Jacksonville Paper itself. There, the Supreme Court recognized that goods could be ordered pursuant to an "understanding," though not part of a specific order. 317 U.S. at 568. The Court also explicitly left open the possibility that shipments purchased in anticipation of the needs of certain customers might remain in interstate commerce when delivered in-state, observing that "a

11

wholesaler's course of business based on anticipation of needs of specific customers, rather than on prior orders or contracts," might "at times be sufficient to establish that practical continuity in transit necessary to keep a movement of goods 'in commerce.'" Id. at 570. Here, the district court recognized that the products delivered by Talton were ordered by Caffey pursuant to an "understanding" implied by law, were ordered to meet the needs of "specific customers," and thus were within the second Jacksonville Paper fact pattern. See Opinion at 10-13. This analysis correctly utilized the applicable legal standard. Id.

B.

Next, Talton contends that the district court, in rendering summary judgment, impermissibly resolved issues of disputed fact. Though the Opinion relied on what the magistrate judge repeatedly characterized as "undisputed facts," see, e.g., Opinion at 8, 11, 12 n.7, Talton maintains that the "undisputed facts" were in fact disputed.

This contention, while less clear than the legal standard issue, is also without merit. Though the Opinion did recite some facts that Talton, on appeal,[2] characterizes as disputed, the

_____

[2] Talton's disputed issues of fact contention on the Motor Carrier Act exemption is new. He did not assert to the magistrate judge that the facts underlying the application of the exemption were disputed, though he did maintain that facts related to other issues were in dispute. With regard to the Motor Carrier Act exemption, Talton argued solely that the application of the Jacksonville Paper doctrine to the facts showed that his employment

12

pivotal point for the court was the very nature of the ABCC statutes and the exclusive relationship that those statutes establish between a beer wholesaler and a beer retailer. The fact of the ABCC statutes' existence and their terms were not in dispute, and thus the court did not improperly resolve disputed issues of fact when it granted summary judgment. See Griffin v. Consol. Foods Corp., 771 F.2d 826, 828 (4th Cir. 1985) (affirming determination of applicability of Motor Carrier Act exemption based on undisputed facts).

## C.

Finally, the district court correctly determined that the products handled and distributed by Talton continued to be in interstate commerce even though they had temporarily paused at the Greensboro warehouse. The Opinion observed that the relationship detailed in the first category of Jacksonville Paper, delivery pursuant to written contract, was unavailable to Caffey because the ABCC statutes prohibit a beer wholesaler from entering into a written contract with a beer retailer. Opinion at 13. The Opinion then concluded, as to the second category of Jacksonville Paper, that, "[c]learly, by operation of North Carolina's ABC law, the

---

was not in interstate commerce. Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. at 5-9. Moreover, he did not assert to the district court that the magistrate judge had erroneously based his recommended ruling on disputed issues of fact. See Pl.'s Objections to Magistrate Judge's Order and Recommendation at 3-4.

13

licensed retailers had an 'understanding' with [Caffey] that [Caffey] was required to provide them with enough beer to meet their sales needs." Opinion at 12. The Opinion reached this conclusion despite the fact that Caffey ordered quantities of beer without specific orders from its retailers because Caffey, as the holder of a state-established monopoly for the wholesaling of beer products, was required to keep its retailers stocked with beer, and "if [Caffey] breached its legal obligations to the licensed retailers, not only would it face potential contract damages, but also the revocation of its business license." Opinion at 13. As a result, the district court properly concluded that the "implied requirements contracts arising out of ABC law in this case are an even stronger legal relationship than most express requirements contracts." Id. The beer products carried in-state by Talton were "different from goods acquired and held by a local merchant for local disposition." Jacksonville Paper, 317 U.S. at 570. We agree with the reasoning of the district court on this point, see Opinion at 8-14, and we are content to adopt it.

### III.

Pursuant to the foregoing, the summary judgment award of the district court is affirmed.

AFFIRMED

14