**Albert GALBREATH et al.**

v.

**GULF OIL CORPORATION.**

Civ. A. No. 10318.

United States District Court
N. D. Georgia,
Atlanta Division.

Oct. 9, 1968.

David H. Fink, Robert L. Mitchell, Bullock, Yancey & Mitchell, Atlanta, Ga., for plaintiffs.

Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Gene F. Presley, John C. Bracy, Atlanta, Ga., for defendant.

## ORDER

EDENFIELD, District Judge.

In this action for overtime compensation pursuant to 29 U.S.C. § 207, the overtime provision of the Fair Labor Standards Act, the facts have been stipulated by the parties. Reduced to the elements pertinent here, they are as follows:

### 1.

This is an action brought under the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 et seq., by Albert Galbreath, Robert C. Wolfe, Clinton M. Lyle, Joe Coffey, Eddie R. Camp, Robert M. Buice, Robert E. Averitt, James H. Collins, Russell Wade, Leon H. Green, Gordon C. Morris, Clyde H. Sewell, James R. Gilbert, George A. Clark, Derrill H. Smith and C. M. Phillips, plaintiffs, against Gulf Oil Corporation, defendant (hereinafter referred to as "Gulf"). Plaintiffs seek recovery in this action of an amount equal to one-half their regular hourly rate of pay for all hours worked by them in their employment with Gulf in excess of forty (40) hours in any workweek during the period July 25, 1964 through October 1, 1965, together with liquidated damages in the same amount, attorney's fees, and interest at the rate of 6% per annum from July 26, 1964, and costs. Gulf Oil is an enterprise engaged in commerce within the meaning of the Fair Labor Standards Act. Gulf has denied that it has any obligation to compensate plaintiffs in the manner prayed for, on the grounds that:

(1) as their duties consisted of transporting petroleum products in interstate commerce, they were employees with respect to whom the Interstate Commerce Commission had power to establish qualifications and maximum hours of service pursuant to the provisions of Section 204 of the Motor Carrier Act, 1935, 49 U.S.C. § 304, and as such were exempt from the overtime pay provisions of the Fair Labor Standards Act of 1938, pursuant to Section 13(b) (1) thereof, 29 U.S.C. § 213(b) (1), and

(2) they were compensated in good faith and in conformity with and reliance on a written enforcement policy of the Administrator of the Wage and Hour Division of the Department of Labor.

### 2.

The plaintiffs were, during the period in issue, employed by Gulf at its Atlanta Bulk Plant, 3141 Parrott Avenue, Atlanta, Georgia. Petroleum products are distributed from this bulk plant to Gulf retail service stations, consumers and other customers of such petroleum products in an L-shaped area consisting of a corridor approximately thirty (30) miles in width running from the Atlanta area westerly to the Georgia-Alabama line, and a corridor approximately twenty (20) miles in width running from the Atlanta area northerly to a line a few miles south of Ellijay, Georgia.

### 3.

The plaintiffs' duties as employees of Gulf consisted mainly of driving either transport trucks or tank wagon trucks

from Gulf's Atlanta Bulk Plant to various locations within the area served by such plant. The plaintiff drivers' duties are performed solely within the State of Georgia and do not require driving over or across state lines. With the exception of a comparatively insignificant amount of other materials, the product transported in such vehicles by the plaintiffs as employees of Gulf consisted either of motor or heating fuels, these products being hereinafter collectively referred to as the "transported products".

#### 4.

All of the transported products were loaded into trucks driven by the plaintiffs at the Chattahoochee Terminal loading rack of Southeast Terminals, Inc., a corporation whose capital stock is jointly owned by Gulf and Pure Oil Corporation. The Chattahoochee Terminal is located directly across Parrott Avenue from Gulf's Atlanta Bulk Plant. Gulf owns six tanks at which petroleum products are received from its refineries. A two- to fifteen-day supply of petroleum products is kept in these tanks pending delivery. All of the products ultimately transported by the plaintiffs were shipped by Gulf to the Chattahoochee Terminal via the 36-inch pipeline of Colonial Pipeline Company (sometimes hereinafter referred to as "Colonial"), from Gulf's refinery at Port Arthur, Texas, or Gulf's Black Creek refinery at Collins, Mississippi, to Colonial's breakout facilities at Powder Springs, Georgia, and from Powder Springs via Colonial's 8-inch Powder Springs-Doraville, Georgia stub line, approximately twelve (12) miles to the Chattahoochee Terminal. Colonial Pipeline Company is a corporation whose capital stock is owned by nine major oil companies. Gulf owns 14% of the stock of Colonial and is the second largest shipper via Colonial on a barrel/miles basis. Because of the volume of movement of product through the 8-inch Powder Springs-Doraville stub line, the product cannot be loaded directly from such line into trucks.

#### 5.

During the period in question, of the approximately 84% of the total gallonage of product shipped by Gulf from the Chattahoochee Terminal which was shipped by means of Gulf trucks driven by plaintiffs and other Gulf drivers, approximately 93% was delivered directly from the terminal to retail service stations and consuming accounts, while the remaining 7% was delivered to bulk plants of distributor-consignees.

#### 6.

The transported products are the identical products tendered to and shipped via Colonial Pipeline Company lines from Gulf's refineries. There is no commingling of product in transit. Gulf withdraws at the Chattahoochee Terminal the same Gulf products tendered at the refinery for shipment to such location via Colonial's Powder Springs-Doraville stub line. The products diverted through such stub line from the main 36-inch line consist of an amount of transported product determined prior to tender to Colonial Pipeline Company. This product is "bled off" at Powder Springs from a much larger "slug" of Gulf products tendered at one of its refineries and moving along the main pipeline destined for Gulf delivery points at Atlanta and other locations along the main line. The amount to be moved to the Chattahoochee Terminal, as well as to all other points along the Colonial line terminating in Linden, New Jersey, is determined by Gulf prior to the initial tender of product for movement at the refinery. With the exception of a deicer added to Gulf A–1 Jet Fuel delivered to one customer served by Gulf's Atlanta Bulk Plant, no processing or alteration of the transported products occurs at the Chattahoochee Terminal or at any location after the product leaves the refinery, nor does the introduction of additives occur at any time after the products leave the refinery.

**7.**

When the transported products are received at the Atlanta Bulk Plant they are received into bulk storage tanks of which there are six at said terminal, having a total usable capacity of 247,900 barrels (42 gallons per barrel).

**·8.**

The retail service stations which account for sale of approximately 68% of the total gallonage of products received by Gulf at the Atlanta Bulk Plant are either owned or leased by Gulf and operated directly by Gulf, owned or leased by Gulf and leased or subleased to dealers who operate them, or owned by others who contract to purchase and sell Gulf products. The stations which account for the majority of Gulf's retail service station sales are those operated directly by Gulf and those owned or leased by Gulf and leased or subleased to dealers who operate them. The station equipment, consisting of tanks, pumps, lift and air compressor, in all cases is owned by Gulf and for stations not operated directly by Gulf is obtained on loan from Gulf under a Memorandum of Agreement to lease. All of the Gulf retail service stations, which account for the sale of 68% of the total gallonage sold by Gulf in its Atlanta Bulk Plant area are either operated directly by Gulf or use Gulf equipment pursuant to such Memorandum of Agreement. Such retail stations form a stable group of recipients of Gulf products whose requirements are computed and projected with reasonable certainty by Gulf sales representatives responsible for such stations. The equipment provided such station operators is installed and maintained by Gulf.

**9.**

The transported products delivered by Gulf to *consuming* accounts, whether fleet, contractor, industrial or governmental subdivision, are sold pursuant to contracts, usually for a term of at least one year, which provide either for the purchase of a specified gallonage of product or for the purchase of the Gulf petroleum requirements of the purchaser during the period covered. The delivery procedure with such customers is pre-arranged—usually at the time the contract is entered into, and as a result of such contracts, 99.9% of the requirements of such *consuming* accounts are, for the most part, known to Gulf before product is received at the Chattahoochee Terminal. During the period in issue, unanticipated local sales at the terminal accounted for an average of 0.1% of the total volume at the terminal. Except for such unanticipated local sales, Gulf does not sell at wholesale at such location to the trade. All automotive gasoline products obtained from such bulk plant and subsequently sold at retail are sold through Gulf service stations.

**10.**

The demand for products at the Atlanta Bulk Plant of Gulf is computed by the evaluation of contractual commitments hereinabove referred to and prior sales experience. The "terminal demand" for product at the Atlanta Bulk Plant arising from such contractual obligations is consolidated in the form of a monthly forecast by grade of product for twelve months and is forwarded to Gulf's Product Supply Division of its Manufacturing Department, whose offices are located in Houston, Texas. These terminal demands are further consolidated in Houston into refinery demands for refined product, which dictate the movement of crude oil from the well-head. The terminal forecast is updated monthly. Sixty days prior to receipt of product at Atlanta a projected shipping schedule showing quantity and grades of product is prepared and forwarded from Atlanta to Houston. On the average this projected supply schedule, prepared sixty days prior to receipt of product, contains projections on required supply of product which are within 2% of the amount which subsequently is actually delivered in the month for which the projection is made. Thirty days prior to expected receipt, a firm shipping schedule is forwarded

from Atlanta to Gulf's Houston Products Supply Division.

11.

With the exception of one heating oil, all transported products are tendered by Gulf to Colonial for shipment on a ten-day cycle. That is, Gulf tenders to Colonial a "slug" of its products, predetermined amounts of which are to be "bled off" the slug at Gulf delivery points along the line from the point of input to Linden, New Jersey. Product destined for the Chattahoochee Terminal requires ten days in transit, and each slug tendered for the Chattahoochee Terminal constitutes approximately a ten-day supply. Gulf's refinery facilities, during the period in issue, as well as at this time, viewed in light of demand for its products, were and are such that the refined product is in short supply. In addition, good business practices dictate that a minimum of funds be tied up in inventory. For these reasons there customarily is in supply at the Chattahoochee Terminal an average of less than five days' supply of the transported products at the time of arrival of a "slug" of products, and an average of between twelve and fifteen days' supply immediately after the delivery of a "slug" into Gulf's tanks at the Chattahoochee Terminal. On the average, approximately ⅖ of the capacity of Gulf's tanks at the Chattahoochee Terminal is used.

12.

The purpose in maintaining the Chattahoochee Terminal of Southeast Terminals, Inc., is to change the mode of transportation of petroleum products from pipeline to motor carrier.

13.

Gulf requires all drivers it employs, including the plaintiffs in this suit, to meet the physical and mental requirements set forth in Part 191 of the Safety Regulations of the Interstate Commerce Commission, 49 C.F.R. Parts 190–97.

Before stating and resolving the issues here, it is well to construct the legal framework upon which the facts assume legal relevance.

Section 7 of the Fair Labor Standards Act provides that employees covered by the Act shall be paid at a rate equalling 1½ times their regular wage for any work in excess of 40 hours per week. The jurisdictional coverage of the Act extends to "industries engaged in commerce", and by way of further definition, the Act provides that

" 'Commerce' means trade, commerce, transportation, transmission, or communication among the several States * * *." 29 U.S.C. § 203(b).

■ Clearly this language, standing alone, would cover these employees, and defendant concedes this to be true. However, there is an exemption in the Act (29 U.S.C. § 213(b) (1)) which provides that the Section 7 overtime provision shall not apply where the Interstate Commerce Commission *has power* to establish qualifications and maximum hours of service under the Motor Carrier Act (49 U.S.C. § 304). It is the applicability of this exemption which presents the present problem. In this connection it is also well to observe that both Acts cannot apply (Morris v. McComb, 332 U.S. 422, 68 S.Ct. 131, 92 L. Ed. 44), and we therefore conclude that a construction of the Motor Carrier Act must ultimately control, for if that Act applies, overtime under FLSA is excluded entirely.

In approaching the applicability of the Motor Carrier Act, the first question is whether the transportation here involved a "practical continuity of movement" from the refinery to the service station so as to be controlled by Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1943), or whether, on the other hand, the goods lost their character as interstate commerce when they came to rest in the Atlanta terminal awaiting further distribution, so as to be controlled by such cases as Atlantic Coast Line R. R. Co. v.

Standard Oil Co., 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 270 (1927).

■ Although there is room for argument on this point, the court concludes that the line of decisions represented by *Jacksonville Paper Co.*, supra, is more nearly in point, and hence that there was continuity of movement so that the goods were moving in "commerce" not merely to the Atlanta terminal but all the way to their ultimate destination at the retail outlet. In other words, as *Jacksonville Paper*, supra, at 568, 63 S.Ct. at 335, says:

> " * * * (I)f the halt in the movement * * * is a convenient intermediate step in the process of getting them to their final destinations, they remain 'in commerce' until they reach those points."

We reach this conclusion on the basis of several facts contained in the stipulation.

(1) In the first place, and most importantly, most of the commerce in question was moving from a Gulf refinery through a Gulf-controlled pipeline and terminal to a Gulf-owned or a Gulf-leased service station whose requirements were known to or controlled by Gulf before the goods were ever shipped. Shipments were made in accordance with a "projected shipment schedule", resulting in shipments within 2% of the amount actually filling orders made by the retail points. Determination of that schedule was made by contractual commitments and prior sales experience with its usual customers. *Jacksonville Paper*, supra, at 569, 63 S.Ct. at 335, specifically based its holding, in part, upon shipments made in anticipation of the needs of specific customers, rather than upon prior orders or contracts. Secondly, Gulf does not fall in the category of the traditional wholesaler; that is, it does not warehouse merchandise in Atlanta for sale to the wholesale trade, and unanticipated local sales by it (as distinguished from shipments forwarded to its own outlets) constituted only 0.1 of 1% of the commerce in question. There is no addi-

tional processing of the product at Gulf's Atlanta terminal, and the goods do not come to rest as a part of a mass of interstate and intrastate merchandise. Under these circumstances, it appears to the court that the ultimate destination of the shipment, even before the shipment was made, was the filling station, and that the halt at the Atlanta terminal was merely a "convenient intermediate stop" in the process of delivery, it being impossible to either deliver by pipeline directly to the ultimate destination or to load directly to a truck from the pipeline.

(2) It is noted that the supply on hand in the storage tanks runs routinely to a two-day minimum supply. Under the necessary circumstances of pipeline shipment it would be difficult to run the supply on hand to any lesser amount. Stated conversely, it would be difficult to move the ten-day supply of product through the change in mode of transportation at any greater speed. In short, the Atlanta terminal was used by Gulf merely to change the mode of transportation, not to end the interstate character of the shipment.

In arguing against the application of *Jacksonville Paper Co.*, supra, the plaintiffs strongly urge that the test applied there is not applicable here because that case involved a construction of the Fair Labor Standards Act, not the Motor Carrier Act and that, as compared to the former, the latter is to be narrowly construed. We shall return to this argument later in this opinion, but suffice it to say that the courts have had no hesitation in applying the *Jacksonville Paper* test in reaching a conclusion that goods "continuously moving" in interstate commerce were subject to MCA and hence exempt from FLSA. See Beggs v. Kroger, 167 F.2d 700 (8th Cir., 1948); Shew v. Southland Corp., 370 F.2d 376 (5th Cir., 1966); and Stewart-Jordan Distributing Co. v. Tobin, 210 F.2d 427 (5th Cir., 1954).

■ We thus conclude that the shipments in question were moving in "com-

merce" from the refinery to the filling station within the meaning of the Motor Carrier Act as well as the Fair Labor Standards Act and, consequently, were subject to regulation by the Interstate Commerce Commission as respects hours of labor, etc. Being thus subject to the Motor Carrier Act, these activities are clearly exempt from the overtime provisions of the Fair Labor Standards Act.

■ Plaintiffs advance as an argument to the contrary a contention that the Fair Labor Standards Act is a remedial statute entitled to a broad construction and that, since the Motor Carrier exemption falls in the category of an exception or an exemption to a remedial statute, it in turn should be strictly construed. But the MCA is likewise a remedial statute and should also be broadly construed. Crescent Express Lines v. United States, 320 U.S. 401, 409, 64 S. Ct. 167, 88 L.Ed. 127 (1943). The cases cited by plaintiffs, relating to a claimed exemption or exception of a particular occupation or status, are therefore not in point. Without discussing them in detail, none of plaintiffs' citations go so far as to hold, or even to suggest, that as between two remedial statutes, each entitled to a broad construction, one should be narrowly construed merely because its coverage was made exempt under the other.

At least one other question, though not argued, deserves consideration. The Motor Carrier Act, in defining commerce, provides that such commerce shall include:

"(C)ommerce between any place in a State and any place in another State or between places in the same State through another State, *whether* such commerce moves wholly by motor vehicle or *partly by motor vehicle and partly by rail, express, or water*." 49 U.S.C. § 303(a) (10). (Emphasis added.)

Here, we have a connecting shipment in commerce, moving partly by motor carrier and partly by pipeline. A movement partly by pipeline is, of course, not strictly the same as a movement partly by "rail, express, or water", and if the quoted words from the Motor Carrier Act are words of limitation, then shipments partly by pipeline and partly by motor vehicle would not be covered by the Motor Carrier Act.

■ As to this feature, the present case appears to be one of first impression, since none of the cases previously cited as requiring motor carrier exemption under the FLSA involved a combination motor carrier and pipeline movement. The court concludes, however, that this makes no difference. First, the grant of power under the Motor Carrier Act is to motor carriers 'engaged in interstate commerce", which would seem to be broad enough to include all interstate commerce. As the Supreme Court has said, "commerce * * * is not a technical legal conception, but a practical one, drawn from the course of business." Swift & Co. v. United States, 196 U.S. 375, 398, 25 S. Ct. 276, 280, 49 L.Ed. 518 (1905), quoted in Jacksonville Paper, supra, 317 U.S. at 570, 63 S.Ct. at 336. And while the definition of commerce as stated in the Motor Carrier Act does not specifically enumerate movements partly by motor carrier and partly by pipeline, it would be strange indeed if a motor carrier carrying the same load of gasoline on the last lap of an interstate movement were held to be subject to the Motor Carrier Act if the truck picked up its load from an interstate train or barge but not from an interstate pipeline.

The applicable rules of statutory construction compel the same conclusion. The court recognizes, of course, that where qualifying terms follow an antecedent in a statute, it is a common approach to hold that the operative language is not to be construed as including others more remote. (See generally 82 C.J.S. Statutes § 334 and cases cited.) Thus it might be argued that the use by Congress of the words "partly by mo-

tor vehicle and partly by rail, express, or water" means that such combination shipments are limited to those enumerated, viz., by "rail, express, or water" and not by pipeline.

■ But this restrictive doctrine of the "last antecedent" is not without limitation, and one persuasive such limitation is contained in Springer v. Government of Philippine Islands, 277 U.S. 189, 48 S.Ct. 480, 72 L.Ed. 845 (1928), which states the following:

"Where a statute contains a grant of power enumerating certain things which may be done and also a general grant of power which, standing alone, would include these things and more, the general grant may be given full effect if the context shows that the enumeration was not intended to be exclusive. See, for example, Ford v. United States, 273 U.S. 593, 611 [47 S.Ct. 531, 71 L.Ed. 793]; [City of] Portland v. [New England] T. & T. Co., 103 Me. 240, 249 [68 A. 1040]; Grubbe v. Grubbe, 26 Or. 363, 370 [38 P. 182]; Swick v. Coleman, 218 Ill. 33, 40 [75 N.E. 807]; Lexington ex rel. v. Commercial Bank, 130 Mo.App. 687, 692 [108 S.W. 1095]; McFarland v. M[issouri], K. & T. Ry. Co., 94 Mo.App. 336, 342 [68 S.W. 105]." 277 U.S. at 206, 48 S.Ct. at 484.

■ In other words, in the enumeration "by rail, express, or water", Congress may have intended not to limit its previous grant of jurisdiction over interstate commerce, but rather to illustrate its breadth, particularly since the enumeration is preceded by the word "whether". The cases hold without exception that words following "whether" do not restrict the meaning to any following terms; rather, they enlarge upon it. A compendium case is State ex rel. and to Use of Berra v. Sestric, 349 Mo. 182, 159 S.W.2d 786 (1942), where a grant of jurisdiction to justices of the peace based on all civil actions "whether such actions be founded upon contract or

tort" was held not restricted to the particulars enumerated. *Sestric* cites Voegtly v. Third Ward School Directors, 1 Pa. 330, 1 Barr. 330, which states:

"The difficulty, in this case, (as in most others,) of ascertaining the meaning of the legislature, arises from the use of *too many words*. * * (I)t is contended that * * * the generality of the first description must be narrowed down to comprehend only such as are specifically named. This would, undoubtedly, be the case if the words of the act had been viz.—to wit—as it is a well known rule of legal construction, that the *videlicet* is used for the purpose of restraining the generality of the preceding term, or of qualifying it, and even of contradicting it. But the word *whether*, neither in common parlance, nor in legal phraseology, has ever had the force of a *videlicet*."

Another case from *Sestric*, Board of Sup'rs, Warren County v. Vicksburg Hospital, 173 Miss. 805, 163 So. 382 (1935), has language particularly engaging and conclusive:

"It may be true, that in construing penal acts, (where courts, to save life, have been exceedingly astute in their criticism of the words of a statute,) an enumeration after the word *whether* might be held as exclusive * * *. But in construing a statute, enacting that 'horses of all descriptions, whether black or white, should be taxed six cents a head,' I think, a judge would be considered captiously astute, who would say that the legislature meant to tax only black and white horses."

See also People, on Complaint of Gobright v. 34th Street Hotel Co., 158 Misc. 839, 286 N.Y.S. 614.

We conclude, therefore, that interstate commerce as used in the MCA includes all combination motor carrier shipments as long as they continue their interstate movement, whether partly by rail, express, water or pipeline.

Finally, a deducible administrative and legislative construction appears to support the exemption here found to exist. In fact, both Congress and two Executive agencies apparently recognize the construction here adopted. In this regard the court notes with great interest a letter sent by the Secretary of Labor to the Fifth Circuit Court of Appeals on request of the court, reported in Shew v. Southland Corp., supra, n. 2, which concerns the very exemption to the Fair Labor Standards Act concerned in this case, 29 U.S.C. § 213(b) (1), and shows that there has been a bill in Congress to eliminate or limit that exemption *each year from 1947 to 1966,* and not one was ever reported out of committee. Further, in his annual reports of 1947 and 1964, the Secretary of Labor recommended changes in the 13 (b) (1) exemption, and in 1947 the "Wage-House Administrator" (presumably the *Wage-Hour* Administrator) recommended the 13(b) (1) exemption be limited to omployees actually covered by ICC regulations—this, as opposed to the statute now in issue which exempts employees under the ICC's potential *power.* The prevailing refusal of Congress to extend the Fair Labor Standards Act to the diminution of the Motor Carrier Act convinces this court that the congressional intent (whether by actual intent, implication or happenstance result) is that there be an area of ICC jurisdiction in which the Commission shall have power to extend its operations, whether it so chooses or not, free and apart from Fair Labor Standards Act jurisdiction.

The character of the movement involved, the rules of statutory construction, and a derived congressional intent all direct a decision here that the ICC has *power* to regulate the hours of labor of plaintiff employees. Consequently, the plaintiffs are within the 13(b) (1) exemption to the Fair Labor Standards Act, and may not recover under its provisions. Accordingly, the complaint is denied and this action is ordered dismissed.