Robert G. TOMLIN, Plaintiff,

v.

JCS ENTERPRISES, INC. and John O. Scott, Jr., Defendants.

Civil Action No. 1:12–CV–3986–AT.

United States District Court, N.D. Georgia, Atlanta Division.

Signed March 28, 2014.

---

**36.** *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

John R. Ulmer, Mitchell Douglas Benjamin, Billips & Benjamin, LLP, Atlanta, GA, for Plaintiff.

Albert A. Chapar, Jr., The Chapar Firm, LLC, Conyers, GA, Rebecca Elizabeth Strickland, Swift, Currie, McGhee & Hiers, LLP, Atlanta, GA, for Defendants.

### ORDER

AMY TOTENBERG, District Judge.

This action arises from Defendants' alleged failure to pay Plaintiff overtime un-der the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 *et seq.* Defendants seek summary judgment in their favor, arguing that Plaintiff is exempt from the FLSA's overtime requirements under the FLSA's Motor Carrier Act ("MCA") exemption. For the reasons discussed below, the Court **GRANTS** Defendants' Motion for Summary Judgment [Doc. 30] and **DENIES** Defendants' Motion to Strike Portions of Declaration of Plaintiff[1] [Doc. 41].

## I. BACKGROUND [2]

Defendant JCS Enterprises, Inc., a Georgia corporation, is primarily a trailer dealership that buys, sells, and rents used tractors, trailers and containers.[3] (Defs.' Statement of Material Facts ("Defs.' SMF") ¶¶ 1, 4–5; Pl.'s Resp. to Defs.' Statement of Material Facts (Pl.'s Resp. SMF) ¶¶ 1, 4–5.) Defendant John O.

---

1. Defendant seeks to strike certain portions of Mr. Tomlin's Declaration. The crux of Defendants' objections relate to alleged inconsistencies between the declaration and Mr. Tomlin's deposition testimony. Mr. Tomlin's Declaration is not inherently irreconcilable with his deposition testimony as Defendants suggest. *See Tippens v. Celotex Corp.*, 805 F.2d 949, 953–954 (11th Cir.1986) (stating that in making the determination whether an affidavit may be stricken as a sham, the court "must be careful to distinguish 'between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence' "). Defendants' challenges go to the credibility of Plaintiff's testimony, an issue that is improper for the Court to sort out on summary judgment. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.... Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.")

(internal citations and quotations omitted). Nonetheless, the Court finds that any alleged inconsistencies are not material to the Court's determination of Defendants' summary judgment motion. Accordingly, the Court **DENIES** Defendants' motion to strike [Doc. 41].

2. Keeping in mind that when deciding a motion for summary judgment, the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the Court provides the following statement of facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir.2007) (observing that, in connection with summary judgment, court must review all facts and inferences in light most favorable to non-moving party). This statement does not represent actual findings of fact. *In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir.2007). Instead, the Court has provided the statement simply to place the Court's legal analysis in the context of this particular case or controversy.

3. JCS also performs service work on tractor-trailers. (Defs.' SMF ¶ 5; Pl.'s Resp. SMF ¶ 5.)

Scott, Jr. is the President of JCS and manages its day-to-day operations. (Defs.' SMF ¶¶ 2–3; Pl.'s Resp. SMF ¶¶ 2–3.)

JCS was classified as a private motor carrier by the United States Department of Transportation ("USDOT") and was assigned a motor carrier identification number by USDOT from 2009–2012, the relevant time period for purposes of this litigation. (Defs.' SMF ¶¶ 11–12; Pl.'s Resp. SMF ¶¶ 11–12.) JCS's operations were subject to regulation and inspection by the USDOT and the Federal Motor Carrier Safety Administration. (Defs.' SMF ¶¶ 13–15; Pl.'s Resp. SMF ¶¶ 13–15; Scott Aff., Exs. A & B.) During the time period 2009 to 2012, JCS owned four tractors used by its drivers for delivering and retrieving trailers, each weighing more than 10,000 pounds. (Defs.' SMF ¶ 30; Pl.'s Resp. SMF ¶ 30; Scott Aff. ¶ 20, Ex. C.)

The JCS truck yard is located in Conley, Georgia. (Defs.' SMF ¶ 56; *see generally* Pl.'s Resp. SMF.) As part of its operations as a trailer dealership, JCS transports trailers that it sells, leases, and purchases to and from customers in Georgia and nationwide. (Defs.' SMF ¶¶ 16–17; Pl.'s Resp. SMF ¶ 16; Scott Dep. at 23, 71, 74, 82, 91, 96, 111–112; Scott Aff., Exs. D–V; Tomlin Dep. at 8.) Plaintiff Robert G. Tomlin was employed as a truck driver for JCS from 2009–2012.[4] (Defs.' SMF ¶¶ 6–

7; Pl.'s Resp. SMF ¶¶ 6–7.) Mr. Tomlin has a commercial driver's license and drove JCS trucks on interstate highways, including Interstates 75 and 285. (Defs.' SMF ¶¶ 8, 34; Pl.'s Resp. SMF ¶¶ 8, 34; Tomlin Dep. at 43.) His job duties included transporting trailers for sale, lease, and purchase either to or from various freight terminals in Georgia or directly to customers located less than a 4 to 5 hour driving radius from the JCS facility. (Defs.' SMF ¶ 36; Pl.'s Resp. SMF ¶ 36; Tomlin Dep. at 12–13, 19–25, 30–31, 42–43.) Mr. Tomlin's daily trips from 2009 to 2012 were mainly in the state of Georgia. (Tomlin Dep. at 10, 19, 21, 31, 38, 61, 101.) According to Mr. Tomlin, he rarely made deliveries to out of state customers. (*Id.* at 19–20, 38, 97, 100–102; Pl.'s Resp. SMF ¶ 37 ("On the rare occasion when another driver was not available, Mr. Tomlin drove a route outside the State of Georgia.")

The method by which JCS transported trailers depended on the point of origin and destination. (Defs.' SMF ¶ 18; Pl.'s Resp. SMF ¶ 18.) Generally, when a trailer is transported between Atlanta, Georgia and a destination that has a freight terminal or is located more than 600 miles from the JCS facility in Conley, Georgia, JCS will ship the trailer via freight lines.[5] (Scott Aff. ¶ 10; Scott Dep. at 21–26; Defs.' SMF ¶ 19.) When JCS sells a trailer to a specific customer located either

---

**4.** Mr. Tomlin was also employed by JCS and its predecessor company at other times that are not relevant to the parties' dispute here. (Defs.' SMF ¶¶ 6–7; Pl.'s Resp. SMF ¶¶ 6–7.)

**5.** The Court notes that Plaintiff purports to dispute the fact that the "trailers were 'shipped' via freight lines during the 2009–2012 time period." (*See* Pl.'s Resp. SMF ¶ 19.) However, Plaintiff's response is argumentative, is not supported by evidence that directly refutes Defendant's fact, and contradicts Mr. Tomlin's own sworn testimony during his deposition. (*See* Tomlin Dep. at 21–

23, 30–31, 101, 103) ("Q: So in addition to picking up trailers and delivering them to JCS customers, for instance, you did that sometimes from freight terminals, right? A: Well, JCS customers, they—the trailers that I picked up from these terminals, the majority of them was his trailers that he had bought in another state somewhere [that JCS] was going to resell. Q: And then when you took trailers to the terminal, they were trailers [JCS] had sold. A: Right, He had sold them trailers, and they were going somewhere else.").

near a freight line where multiple trailer shipments are being made or more than 600 miles from the JCS facility, JCS uses a freight liner to ship the trailer to that customer. (*See* Scott Aff. ¶ 12; Scott Dep. at 22, 24–28.) JCS uses a tractor to transport the trailer to an in-state freight terminal, and the freight line then delivers the trailer either to a freight yard near the customer or directly to the customer.[6] (Scott Aff. ¶ 11; Scott Dep. 22, 25–28; Defs.' SMF ¶ 20.) JCS received a discount in the shipping charges of its trailers if it permitted the freight company to ship the trailers loaded with goods of a third-party for delivery to a freight terminal located in the same city/state as a JCS customer. (Scott Dep. at 24, 26–29) (The freight company gets to use our trailer free of charge and they deliver it where we want it and ... we [only] have to pay them a minimal fee just to keep up with the paperwork."). JCS drivers, including Mr. Tomlin, would deliver empty trailers to the freight terminal, where the goods are loaded by the freight company. (*Id.* at 26–30.) Once the trailer arrives at its destination, the goods are removed before the trailer is delivered to or retrieved by JCS's customer. (*Id.* at 27–8.) JCS maintains responsibility for damage to or destruction of the trailers en route. (*Id.* at 31.)

Generally, when a trailer is being transported to or from a location that is not near a freight terminal but is within a four or five hour driving radius from JCS, one of JCS's drivers will drive the trailer between the two locations. (Scott Aff. ¶ 15;

Defs.' SMF ¶ 24). For instance, when JCS delivers a trailer directly to the customer located within the four to five hour driving radius from JCS, that delivery requires that the driver cross state lines if the customer is located in a state other than Georgia.[7] (Scott Aff. ¶ 17; Defs.' SMF ¶ 24.)

## II. STANDARD OF REVIEW ON SUMMARY JUDGMENT

The Court may grant summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56. The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *Id.* An issue is material only if its resolution could affect the outcome of the action. *Id.*

"The district court should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his favor." *United States v. Four Parcels of Real Prop.,* 941 F.2d 1428, 1437 (11th Cir.1991) (citations and punctuation omitted). The court may not weigh conflicting evidence or make credibility determinations. *Hairston v. Gainesville Sun Publ'g. Co.,* 9 F.3d 913, 919 (11th Cir.1993), *reh'g denied,* 16 F.3d 1233 (1994) (en banc).

---

**6.** The Court notes that Plaintiff purports to dispute the fact that the "freight lines delivered trailers to customers of JCS during the 2009–2012 time period." (*See* Pl.'s Resp. SMF ¶ 20.) However, Plaintiff's response is argumentative and is not supported by evidence that directly refutes Defendant's stated fact.

**7.** The Court notes that Plaintiff disputes this fact to the extent that Mr. Tomlin was not one of the JCS drivers who generally drove across state lines. However, Mr. Tomlin does not dispute that he has on occasion traveled outside the state of Georgia to pick up or deliver trailers from out of state. (*See* Pl.'s Resp. SMF ¶¶ 36, 45–46) ("Undisputed that Mr. Tomlin has delivered trailers outside Georgia."); (Tomlin Dep. at 101–102.)

For issues upon which the moving party bears the burden of proof at trial [8], the moving party must affirmatively demonstrate the absence of a genuine issue of material fact as to each element of its claim on that legal issue. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993). It must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial. *Id.* If the moving party makes such a showing, it is entitled to summary judgment unless the non-moving party comes forward with significant, probative evidence demonstrating the existence of an issue of fact. *Id.* The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505; *Tippens v. Celotex Corp.*, 805 F.2d 949, 952–53 (11th Cir.1986) ("The principal function of the motion for summary judgment is to show that one or more of the essential elements of a claim or defense ... is not in doubt and that, as a result, judgment can be rendered as a matter of law.").

■ "Summary judgment is a lethal weapon, and courts must be mindful of its aims and targets and beware of overkill in its use.... Summary judgment is such a

lethal weapon, depriving a litigant of a trial on the issue, caution must be used to ensure only those cases devoid of any need for factual determinations are disposed of by summary judgment." *Tippens*, 805 F.2d at 952–53.

## III. ANALYSIS

■ The FLSA requires employers to pay overtime to employees who work more than forty hours per week. 29 U.S.C. § 207(a)(1). However, the FLSA specifically exempts from this requirement "any employee with respect to whom the Secretary of Transportation [9] has power to establish qualifications and maximum hours of service pursuant to the provisions of" the Motor Carrier Act, commonly known as the Motor Carrier Act ("MCA") exemption. 29 U.S.C. § 213(b)(1); *Abel v. Southern Shuttle Servs., Inc.*, 631 F.3d 1210, 1212 (11th Cir.2011). "Congress created this exemption to eliminate any conflict between the jurisdiction exercised by the Department of Labor ("DOL") over the FLSA and the mutually exclusive jurisdiction exercised by the DOT over the MCA." *Walters v. Am. Coach Lines of Miami, Inc.*, 575 F.3d 1221, 1226 (11th Cir.2009) (citing *Spires v. Ben Hill County*, 980 F.2d 683, 686 (11th Cir.1993)).

■ In light of the comprehensive remedial purposes of the Act,[10] the Court

---

8. When the non-moving party bears the burden of proof at trial, however, the moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim. *Fitzpatrick*, 2 F.3d at 1115. Instead, the moving party may point out to the district court that there is an absence of evidence to support an element of the non-moving party's case. *Id.* The non-moving party must then respond with sufficient evidence to withstand a directed verdict motion at trial. Fed.R.Civ.P. 56(e); *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir.1994).

9. As originally enacted in 1935, the Motor Carrier Act gave the authority to regulate

common carriers and contract carriers by motor vehicle to the Interstate Commerce Commission ("ICC"). *See* 49 U.S.C. § 304(a)(1) & (2) (repealed and subsequently recodified at 49 U.S.C. § 31502). In 1966 Congress transferred the authority to regulate Section 304 of the Motor Carrier Act from the ICC to the United States Department of Transportation ("DOT"). *See* Act of Oct. 15, 1966, P.L. 89–670, § 6, 80 Stat. 937; 49 U.S.C.App. § 1655(e)(6)(c).

10. The primary purpose of the FLSA is the protection of the nation's employees from detrimental labor conditions and to provide a minimum subsistence wage. *See Brooklyn*

construes exemptions under the FLSA narrowly against the employer seeking to assert them. *Walters,* 575 F.3d at 1226; *Nicholson v. World Bus. Network, Inc.,* 105 F.3d 1361, 1364 (11th Cir.1997) ("To extend an exemption to other than those plainly and unmistakably *within its terms and spirit* is to abuse the interpretative process and to frustrate the announced will of the people."); *see also Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960). The employer bears the burden of proving its entitlement to an exemption. *Walters,* 575 F.3d at 1226; *Abel v. Southern Shuttle Services, Inc.,* 631 F.3d 1210, 1212 (11th Cir.2011).

### A. Application of the FLSA's Motor Carrier Exemption

Defendants have moved for summary judgment on the grounds that Plaintiff's claims under the FLSA are barred because he is subject to the Motor Carrier Act exemption. Specifically, Defendants contend that Mr. Tomlin's duties affected interstate commerce in two ways: (1) Mr. Tomlin's delivery and retrieval of trailers from freight terminals located solely in the state of Georgia constitutes a link in a continuous stream of interstate commerce; and (2) Mr. Tomlin was called upon, from time to time, to transport and retrieve trailers across state lines.

The Eleventh Circuit has interpreted the statutory scheme of the MCA and held that the MCA "confers upon the Secretary of Transportation the authority to regulate the maximum hours of service of employees who are employed (1) by a common carrier by motor vehicle; (2) engaged in interstate commerce; and (3) whose activities directly affect the safety of operations

of such motor vehicles." *Walters,* 575 F.3d at 1226–27 (quoting *Spires v. Ben Hill Cnty.,* 980 F.2d at 686 (internal quotations omitted)); *Abel,* 631 F.3d at 1212. The MCA conveys authority to the Secretary of Transportation "'over transportation by motor carrier' in various contexts, including between places in different states [and] between places in the same state if the transport passes through another state. . . ." *Walters,* 575 F.3d at 1227. The applicability of the motor carrier exemption "depends both on the class to which his employer belongs and on the class of work involved in the employee's job." *Id.* (quoting 29 C.F.R. § 782.2).

Accordingly, The Motor Carrier Act exemption applies only to those employees who are (1) employed by a motor carrier as defined by the MCA; and (2) whose activities directly affect the safety of operations of such motor vehicles engaged in interstate commerce. *See* 29 C.F.R. § 782.2(a); *Walters,* 575 F.3d at 1226–1227; *Abel,* 631 F.3d at 1212–13; 29 C.F.R. § 782.2. The term "motor carrier" means "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14). The term "motor private carrier" (commonly referred to as "private motor carrier") as used in the MCA is defined as:

> [A] person, other than a motor carrier, transporting property by motor vehicle when—
>
> (A) the transportation is as provided in section 13501 of this title; [i.e., in interstate commerce];
>
> (B) the person is the owner, lessee, or bailee of the property being transported; and

*Sav. Bank v. O'Neil,* 324 U.S. 697, 706–07, 65 S.Ct. 895, 89 L.Ed. 1296 (1945), *reh'g denied* 325 U.S. 893, 65 S.Ct. 1189, 89 L.Ed. 2005

(1945); *Nicholson v. World Bus. Network, Inc.,* 105 F.3d 1361, 1363 (11th Cir.1997); *see also* 29 U.S.C. §§ 202(a), 206, 207, 212.

(C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise.

49 U.S.C. § 13102(15).

### 1. Whether Plaintiff was employed by a motor carrier as defined by the MCA

 The parties do not dispute that JCS is classified as a private motor carrier[11] by the United States Department of Transportation (DOT) and was subject to regulation by the DOT for the relevant time period of 2009 to 2012. (Defs.' SMF ¶¶ 11, 15; Pl.'s Resp. SMF ¶¶ 11, 15.) "Evidence that a carrier has a permit or license from the Department of Transportation is sufficient to prove jurisdiction." *Vidinliev v. Carey Intern. Inc.*, 581 F.Supp.2d 1281, 1285 (N.D.Ga.2008); *Baez v. Wells Fargo Armored Serv. Corp.*, 938 F.2d 180, 182 (11th Cir.1991) (citing 29 C.F.R. § 782.1(b) and holding that the issuance of the permit by the Secretary indicates that jurisdiction under the MCA has already been exercised).

### 2. Whether Plaintiff's job duties directly affected the safety of operations of motor vehicles engaged in interstate commerce

It is undisputed that Tomlin was employed as a commercial truck driver for JCS, that he drove JCS's trucks on public highways, and that he performed safety inspections of the trailers he hauled to ensure they were road-worthy. (Defs.' SMF ¶ 6, 8, 38; Pl.'s Resp. SMF ¶¶ 6, 8, 38; *see also* Tomlin Dep. at p. 44.) Drivers, as defined under the MCA, are among a class of workers who have been held to directly affect safety of motor vehicle operation as a matter of law. *Vidinliev*, 581

F.Supp.2d at 1286; 29 C.F.R. 782.3(b). Thus, the central dispute in this case is whether Tomlin transported property in interstate commerce.

### a. Whether Plaintiff's intrastate driving duties constituted interstate commerce

The FLSA regulations governing the MCA exemption, and specifically addressing the precise issue before the Court, provide that:

> Highway transportation by motor vehicle from one State to another, in the course of which the vehicles cross the State line, clearly constitutes interstate commerce under both acts. Employees of a carrier so engaged, whose duties directly affect the safety of operation of such vehicles, are within the exemption in accordance with principles previously stated. The result is no different where the vehicles do not actually cross State lines but operate solely within a single State, if what is being transported is actually moving in interstate commerce within the meaning of both acts; the fact that other carriers transport it out of or into the State is not material.
>
> . . .
>
> The Interstate Commerce Commission held that transportation confined to points in a single State from a storage terminal of commodities which have had a prior movement by rail, pipeline, motor, or water from an origin in a different State is [ ] in interstate or foreign commerce within the meaning of part II of the Interstate Commerce Act [unless] the shipper has no fixed and persisting transportation intent beyond the terminal storage point at the time of shipment. The Commission specifically

---

**11.** The Court notes that JCS also contends that it meets the definition of motor carrier because it transports trailers it purchases in furtherance of its commercial enterprise by transporting trailers for the U.S. Army. (*See* Def.'s Br. at 9 (citing Scott Aff. ¶ 19).)

ruled that there is not fixed and persisting intent where: (i) At the time of shipment there is no specific order being filled for a specific quantity of a given product to be moved through to a specific destination beyond the terminal storage, and (ii) the terminal storage is a distribution point or local marketing facility from which specific amounts of the product are sold or allocated, and (iii) transportation in the furtherance of this distribution within the single State is specifically arranged only after sale or allocation from storage.

29 C.F.R. § 782.7(b)(1) & (b)(2) (citations omitted).

The Eleventh Circuit has held that the Secretary of Transportation's authority under the MCA is not limited solely to transportation that actually crosses state lines; therefore drivers need not physically travel outside of a single state to meet the "interstate commerce" requirement of the MCA. *See Walters,* 575 F.3d at 1229 (holding that driving intrastate airport-to-seaport shuttle bus routes for cruise ship passengers "constituted interstate commerce"); *Abel,* 631 F.3d at 1216–17; *Baez,* 938 F.2d at 182 (holding that drivers engaged in security armored truck pickup and delivery services to and from service banks and commercial establishments within the state of Florida, involving the pickup and delivery of coins and currency, checks (both in-state and out-of-state checks), mail and other items of value, bound for banks outside the state of Florida were exempt from the FLSA overtime requirements under the MCA). Rather, "purely intrastate transportation can constitute part of interstate commerce if it is part of a 'continuous stream of interstate travel.' " *Walters,* 575 F.3d at 1229; *Abel,*

631 F.3d at 1216–17; *Baez,* 938 F.2d at 182.

As the Supreme Court explained in *United States v. Yellow Cab Co.,*

When persons or goods move from a point of origin in one state to a point of origin in another, the fact that a part of that journey consists of transportation by an independent agency solely within the boundaries of one state does not make that portion of the trip any less interstate in character.

332 U.S. 218, 228, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947); *Walters,* 575 F.3d at 1229. "For this to be the case, there must be a 'practical continuity of movement' between the intrastate segment and the overall interstate flow." *Walters,* 575 F.3d at 1229 (citations omitted) (quoting *Walling v. Jacksonville Paper Co.,* 317 U.S. 564, 568, 63 S.Ct. 332, 87 L.Ed. 460 (1943)).

In determining whether the particular facts of the case establish a "practical continuity of movement" between two states, the Court in *Walters* relied on its [12] decisions in several former Fifth Circuit cases, including *Marshall v. Victoria Transp. Co., Inc.* and the Supreme Court's earlier decision in *United States v. Capital Transit Co.,* noting:

In *Marshall,* we addressed a city bus service in Brownsville, Texas, which often transported people who had walked across the Mexican border before boarding the bus. *See Marshall,* 603 F.2d [1122] at 1123–24 [5th Cir.1979]. We characterized the transportation of people making international journeys as "a regular, recurring and substantial part" of the bus drivers' overall workload. *Id.* at 1125. Because the drivers' work thereby was "entwined with a continu-

**12.** In *Bonner v. City of Prichard,* the Eleventh Circuit adopted as binding precedent cases decided by the Fifth Circuit prior to the close of business on September 30, 1981. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981).

ous stream of international travel," we concluded that the drivers were engaged in interstate commerce, even though their routes were solely intrastate. *Id.* The Supreme Court reached a similar conclusion in *United States v. Capital Transit Co.*, 338 U.S. 286, 70 S.Ct. 115, 94 L.Ed. 93 (1949). That case involved a bus service that drove routes within the District of Columbia that took commuters to locations where they then could board buses bound for Virginia. *See id.* at 288, 70 S.Ct. at 116. The Court found that the Interstate Commerce Commission ("ICC") [now the Secretary of Transportation] had regulatory authority under the MCA over those intra-district bus routes because they were "part of a continuous stream of interstate transportation" and thus formed "an integral part of an interstate movement." *Id.* at 290, 70 S.Ct. at 117. *Walters*, 575 F.3d at 1229–30. The Court in *Walters* therefore concluded that the company's airport-to-seaport shuttle bus routes came under the Secretary of Transportation's MCA jurisdiction because the shuttle trips shared "a practical continuity of movement with the interstate or international travel of the cruise lines and their passengers, just as the Brownsville bus

routes did for their riders' cross-border journeys. For cruise ship passengers arriving at the airport or seaport, [the company's] shuttle rides would be part of the continuous stream of interstate travel that is their cruise vacation." *Id.* at 1230.

The Eleventh Circuit has ruled similarly in the context of intrastate transportation of goods as part of a continuous stream of interstate commerce. In *Galbreath v. Gulf Oil Corp.*, truck drivers employed by Gulf Oil sought overtime compensation under the FLSA. *Galbreath*, 413 F.2d 941 (5th Cir.1969). The employees' duties consisted mainly of driving transport trucks from Gulf's petroleum distribution plant and adjacent terminal in Atlanta, Georgia and delivery of petroleum products to Gulf's local retail service stations in Georgia. The petroleum arrived at the Atlanta plant from Gulf's refineries in either Texas or Mississippi via a 36–inch pipeline owned by Colonial Pipeline Company. Although there were several terminals along the pipeline, the Court found that "the transported products are the identical products tendered to and shipped via Colonial Pipeline Company lines from Gulf's refineries; there is no commingling of product in transit." *Id.* at 943.[13]

---

13. The Court described this process in detail as follows:

> All of the products ultimately transported by plaintiffs were shipped by Gulf to the Chattahoochee Terminal, located across from Gulf's Bulk Plant, via the 36–inch pipeline of Colonial Pipeline Company from Gulf's refinery at Port Arthur, Texas, or Gulf's Black Creek refinery at Collins, Mississippi, to Colonial's breakout facilities at Powder Springs, Georgia, and from Powder Springs via Colonial's 8–inch stub line approximately 12 miles to the Chattahoochee Terminal.... Gulf withdraws at the Chattahoochee Terminal the same Gulf products tendered at the refinery for shipment through Colonial's pipelines. The products diverted through the Powder Springs, Geor-

> gia stub line from the main 36–inch line consist of an amount of transported product determined prior to tender to Colonial. This product is 'bled off' at Powder Springs from a much larger 'slug' of Gulf products tendered at one of its refineries and moving along the main pipeline destined for Gulf delivery points at Atlanta and other locations on the main line. The amount to be moved to the Chattahoochee Terminal, as well as to all other points along the Colonial line (which terminates in Linden, N.J.) is determined by Gulf prior to the initial tender of product for movement at the refinery. With the exception of a de-icer added to Gulf A–1 Jet Fuel delivered to one customer served by Gulf's Atlanta Bulk Plant, no processing or alteration of the transported products occurs at the Chatta-

The Court in *Galbreath* defined the issue of whether the Motor Carrier Act exemption applied as being "dependent upon whether the petroleum product came to rest in Atlanta and lost its interstate character or whether there was a continuity of movement of the goods from the refineries through the Atlanta plant and terminal such that the petroleum was at all times part of interstate commerce." *Id.* at 944. In considering whether the district court properly determined that the petroleum products were continuously moving in interstate commerce until they reached the retail service stations, *Galbreath* looked to the Supreme Court's decision in *Walling v. Jacksonville Paper Co.*, dealing with the applicability of the FLSA and establishing the "practical continuity of movement" test to determine the relationship of one-state activities to interstate commerce. There the Supreme Court said:

> 'The entry of the goods into the warehouse interrupts but does not necessarily terminate their interstate journey. A temporary pause in their transit does not mean that they are no longer 'in commerce' within the meaning of the Act. * * * if the halt in the movement of the goods is a convenient intermediate step in the process of getting them to their final destinations, they remain 'in commerce' until they reach those points. Then there is a practical continuity of

movement of the goods until they reach the customers of whom they are intended. That is sufficient. Any other test would allow formalities to conceal the continuous nature of the interstate transit which constitutes commerce.'

317 U.S. 564, 568, 63 S.Ct. 332, 87 L.Ed. 460 (1943). Following the rationale stated in *Walling*, the *Galbreath* Court concluded that the petroleum in question did not come to rest at the Atlanta plant but passed through it in a "practical continuity of movement" in interstate commerce and that the delivery drivers were engaged in interstate commerce under the MCA exemption and were thus not entitled to overtime under the FLSA. *Id.* at 946–47.[14] In concluding that there was no "cessation or interruption of movement," the *Galbreath* Court reasoned that: (1) the products were shipped on the basis of contractual commitments with consumers, (2) Gulf retained control over the products from the time they left the refinery until they were delivered to the consumer, (3) the products did not stay at the distribution plant for an indeterminate time but were moved according to a predetermined schedule on a fairly regular basis, (4) the purpose of the terminal adjacent to the Atlanta plant was to change the method of transporting the products, and (5) the products involved were neither commin-

hoochee Terminal or at any location after the product leaves the refinery, nor does the introduction of additives occur at any time after the products leave the refinery. 413 F.2d at 942–43.

**14.** *Compare Shew v. Southland Corp.*, 370 F.2d 376 (5th Cir.1966) (holding that dairy products which came from out of state and stopped in Dallas temporarily (where no processing took place) were part of a continuous movement in interstate commerce so that truck drivers who delivered the products from the Dallas plant to other points in Texas were engaged in interstate commerce and therefore

fell within the Motor Carrier Exemption to the FLSA and were not entitled to overtime compensation), *with Kline v. Wirtz*, 373 F.2d 281 (5th Cir.1967) (per curiam) (finding that "district court had ample basis to conclude that the 'interstate' movement ceased when the meat was delivered to Employer's storage and processing area. There at least a substantial part of the Iowa meat was boned, trimmed, and cut to order before delivery to customers, thus interrupting the continuity of transit between its out-of-state origin and the ultimate destination").

gled during transit nor processed in any way at the terminal. *Id.* at 947.

Similarly, in *Opelika Royal Crown Bottling Co. v. Goldberg,* the Circuit Court held that drivers engaged in intrastate transportation of empty soft drink bottles were exempt from overtime compensation under § 213(b)(1). *Opelika,* 299 F.2d 37 (5th Cir.1962). Although the employees themselves traveled only intrastate, the empty bottles being transported were destined for a bottling plant in a neighboring state. *Id.* at 40, 43. Relying on the Supreme Court's statement in *Walling* that the clear "purpose of the Act was to extend federal control in this field throughout the farthest reaches of the channels of interstate commerce," the Court in *Opelika* rejected the employee's argument that the return route of the empty bottles was de minimis. *Id.* at 40. Rather, the Court held that "the Act will reach any substantial movement of goods whether they be empty or full." *Id.* (construing "interstate commerce" under the FLSA and later applying the MCA exemption to the employee's claim for overtime). Under the specific facts in *Opelika,* the Court found that the return route of the empty bottles was clearly an integral part of the company's business and that under its agreement with the distributor an equivalent number of empty bottles were required to be returned before additional full bottles could be obtained from the distributor. *Id.* The Court further held that the handling of the empty bottles was a substantial part of the employees' duties and that "[p]rovided the other requirements necessary for the establishment of goods moving in commerce are shown, we are of the opinion that the movement of empty bottles may create a sufficient channel of interstate commerce." *Id.*

■ As a commercial driver for JCS, Mr. Tomlin's primary daily job duty was to transport trailers to and from freight terminals in Georgia for sale, purchase, and/or lease across state lines. (*See* Tomlin Decl. ¶¶ 30–31; Tomlin Dep. at 21–25, 101, 103.) Mr. Tomlin testified that as part of his daily job, he drove to freight terminals in several Georgia cities, including Atlanta, Marietta, Conley, and Ellenwood, to pick up trailers shipped to JCS from out of state vendors or to deliver trailers being sold by JCS to out of state customers. (Tomlin Dep. at 21–23, 101.) Mr. Tomlin conceded that 100 percent of the JCS trailers delivered to freight terminals in Georgia were to be shipped out of state. (*Id.* at 103.) Mr. Tomlin further acknowledged that he was the principal JCS employee tasked with the majority of the freight terminal pickups and deliveries. (*Id.* at 25.) Accordingly, the Court finds that Mr. Tomlin's instate driving constituted part of interstate commerce because it served as one leg of the interstate journey of the trailers.

**b. Whether there was practical continuity of movement between the intrastate segment and the overall interstate flow of the transportation of the trailers**

Plaintiff argues that a break in the continuity of interstate commerce occurred when the trailers were delivered to the freight terminal and were loaded with the goods of a third-party customer located in the same state as JCS's customer. (*See* Pl.'s Resp. at 2–3, 14–17) ("By permitting the trailers it sold to be used to transport the goods of third parties for hire, the trailer itself ceased to be legally considered 'goods' and became a 'motor vehicle' under the law. Only once those goods were removed from the trailer and the empty trailer delivered to its purchaser does the law consider the trailer to once again be considered 'goods.' The legal change in character of the trailers ... is

**1342**

fatal to Defendant's argument that Plaintiff's transport of the empty trailer to a freight depot within the state of Georgia constitutes a continuous stream of interstate transportation."). Relying solely on the statutory definitions of "motor carrier," "private motor carrier," and "motor vehicle," Plaintiff asserts that the movement of Defendants' trailers is not one continuous stream of commerce, but rather several distinct commercial transactions which occur in sequence.

"Neither continuity of interstate movement nor isolated segments of the trip can be decisive. The test is one of practicality. As long as the carrier is in process of getting goods to their final destination, the goods remain in [interstate] commerce." *George R. Hall, Inc. v. Superior Trucking Co., Inc.,* 514 F.Supp. 581, 584 (N.D.Ga. 1981) (determining jurisdiction under the Interstate Commerce Act) (citing *New York, New Haven & Hartford Railroad Co. v. Nothnagle,* 346 U.S. 128, 130, 73 S.Ct. 986, 97 L.Ed. 1500 (1953), *Walling v. Jacksonville Paper Co.,* 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1943), and *Galbreath v. Gulf Oil Corp.,* 294 F.Supp. 817 (N.D.Ga.1968), *aff'd,* 413 F.2d 941 (5th Cir. 1969)). "Whether the transportation is of an interstate nature can be 'determined by reference to the intended final destination' of the transportation when the ultimate destination was envisaged at the time the transportation commenced. The intent at the time of transportation commences 'fixes the character of the shipment for all the legs of the transport within the United States.'" *Bilyou v. Dutchess Beer Distributors,* 300 F.3d 217, 223–24 (2d Cir.

2002) (citing, inter alia, *Atlantic Coast Line R. Co. v. Standard Oil Co. of Kentucky,* 275 U.S. 257, 269, 48 S.Ct. 107, 72 L.Ed. 270 (1927) (determining continuity of transportation by examining whether the destination of the goods "is arranged for or fixed in the minds of the sellers")).

▆ The Court is not persuaded that JCS is converted from a private motor carrier to a motor carrier because JCS allows its trailers to serve merely as a vessel housing the goods of a third party in transit. Nor is the Court persuaded that any such change in character impacts the interstate nature of the commerce at issue. The trailers are not physically altered or transformed upon being loaded with goods. Rather, JCS delivers its trailers to the freight terminals for continued transportation to their final destination, but retains responsibility for any damage to the trailers caused during transit.[15] JCS is not itself transporting the trailers, but has turned them over to the freight company for delivery to its customers. Contrary to Plaintiff's assertion, at the point it has turned over the trailer to the freight company for delivery to its customer, JCS does not meet the statutory definition of "motor carrier" meaning "a person providing motor vehicle transportation for compensation." JCS is not providing transportation, but has delivered its goods—the trailers—for delivery by an independent company providing transportation of those goods to JCS's customers. The intended final destination of JCS's trailers is to its specific out of state customers.[16] (See Scott Aff. ¶ 12.) Thus, the

---

**15.** Based on the facts presented in the record on summary judgment, it appears that the freight terminal acts as a "freight forwarder," on behalf of JCS and these third-party shippers by consolidating the shipments of the goods and the trailer and assuming responsibility for the transportation from the terminal

to the place of destination. *See* 49 U.S.C. § 13102(8).

**16.** The same is true for the trailers JCS purchases for shipment from its' out of state vendors. (*See* purchase invoices attached as Ex. D to Scott Aff.)

brief halt in the movement of the trailers at the freight terminal for the purpose of loading the third-party goods "is a convenient intermediate step in the process of getting [the trailers] to their final destinations [and] they remain 'in commerce' until they reach those points," which are indisputably across state lines. *See Walling,* 317 U.S. at 568, 63 S.Ct. 332; *Opelika,* 299 F.2d at 40 ("[T]he Act will reach any substantial movement of goods whether they be empty or full."); *George R. Hall, Inc. v. Superior Trucking Co., Inc.,* 514 F.Supp. at 584 (N.D.Ga.1981) (finding that despite the attempted transfer of the goods from one truck to another and the attempted diversion of the goods to Atlanta, the goods were still involved in the practical continuity of movement out of state since they were still en route to their final destination).

██ "It is the character of the activities rather than the proportion of either the employee's time or of his activities that determines" whether he will be subject to the authority of the Secretary of Transportation under the MCA. *Levinson v. Spector Motor Service,* 330 U.S. 649, 674–675, 67 S.Ct. 931, 91 L.Ed. 1158 (1947). Here, the record is clear that Mr. Tomlin's job duties included regular daily transportation of trailers to and from the freight terminals. Mr. Tomlin also admits that he occasionally made deliveries of trailers to JCS's out-of-state customers. Therefore, the Court need not determine what percentage of total hours Mr. Tomlin spent driving back and forth between the JCS facility and the freight terminals (or in certain instances to JCS's out of state customers) in order to conclude that summary judgment as to the MCA exemption is proper. *See, e.g., Webb v. Athens Newspapers, Inc.,* 999 F.Supp. 1464, 1472 (M.D.Ga.1998) (holding that employees engaged in "interstate commerce" within meaning of MCA exemption where they made daily intrastate deliveries of newspaper supplements printed outside the state, and stored at newspaper's terminal for brief period of time prior to scheduled delivery based on accurate subscription forecasts). The MCA's exemption applies to Mr. Tomlin's freight terminal deliveries and pickups involving "exclusively intrastate transportation or handling of goods that were bound for out-of-state destinations." *Walters,* 575 F.3d 1221. As the transportation of trailers purchased or sold by JCS out of state was a regular, recurring, and substantial part of Tomlin's work as a driver in operation of all routes assigned by JCS, the Court finds that his work was "entwined with a continuous stream" of interstate commerce within the meaning of the MCA. *See Marshall,* 603 F.2d 1122.

## IV. CONCLUSION

For these reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment [Doc. 30]. The Clerk is **DIRECTED** to close the case.